## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **SEA SALT, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.** |
| | ) | |
| **TD BANK, N.A.,** | ) | |
| | ) | |
| **BELLEROSE INVESTMENT GROUP, LLC,** | ) | |
| | ) | |
| **KIMBERLY MASTROPASQUA,** | ) | |
| | ) | |
| **CORY POULIN,** | ) | |
| | ) | |
| **PLATINUM PAWN & LOAN,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **CONSTANCE BELLEROSE,** | ) | |
| | ) | |
| **Defendants** | ) | |

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sea Salt, LLC, by and through undersigned counsel, hereby complains against Defendants as follows:

### INTRODUCTION

1.      This case alleges newly discovered facts related to a criminal conspiracy to embezzle more than $1.5 million in profits and stolen lobster from Sea Salt, LLC ("Sea Salt"). The underlying criminal conspiracy is detailed in an embezzlement case already filed in this Court, captioned *Sea Salt, LLC v. Matthew R. Bellerose, et al.*, Case No. 2:18-cv-00413. The defendants in that case (hereinafter referred to as the "Bellerose litigation") include Matthew R.

1

Bellerose ("MRB") and Vincent J. Mastropasqua ("VJM"), as well as their sham corporate entity, East End Transport, LLC (East End). Sea Salt also sued Anthony J. Mastropasqua, who was a "broker" for the sale of lobster stolen from Sea Salt, and Bellerose's wife, Amanda F. Bellerose.

2.      This action, hereinafter referred to as the "TD Bank litigation," alleges claims against new parties who are not defendants in the Bellerose litigation. The claims could not have been brought in the Bellerose litigation because the facts underlying them were not known until late December of 2019.[1] The claims advanced in this TD Bank litigation include the following:

A.      Claims against **TD Bank, N.A.** for failing to disclose assets and accounts

belonging to Bellerose Investment Group, LLC, which at the time of Plaintiff's

---

[1] As a result, the doctrines of collateral estoppel and res judicata do not bar this TD Bank litigation. Under Maine law, res judicata "prevents the relitigation of matters already decided." *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶¶ 7-9, 940 A.2d 1097, 1099-1100. The parties cannot "again come forward in the same legal mission against the same parties to secure a remedy" that was previously denied. *Id.* (citing *Harriman v. Border Trust Co.*, 2004 ME 28, ¶ 5, 842 A.2d 1266, 1267; *Macomber v. MacQuinn-Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131, 138-39). Res judicata can take two different forms, issue preclusion and claim preclusion. *Id.* Claim preclusion will bar relitigation if: "(1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action." *Id.* (citing *Macomber*, 2003 ME 121, ¶ 22, 834 A.2d at 139). Here, none of the prongs of claim preclusion are applicable. First, Sea Salt is suing new parties who were not defendants in the Bellerose litigation. Second, a valid final judgment has not issued in that litigation against any party with regard to liability (as opposed to East End Transport, LLC's default judgment). Finally, the matters presented for decision in this TD Bank litigation were not, and could not have been, litigated in the Bellerose Litigation. Issue preclusion, also called collateral estoppel, will bar the relitigation "of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." *Id.* Here again, issue preclusion does not bar the instant action because no factual issues have been determined by a prior final judgment that has any bearing on the issues advanced.

trustee summons to TD Bank had Matthew Bellerose listed as the beneficial owner of the account.

B.    Claims of fraudulent transfer, conversion, and civil RICO against Defendant **Bellerose Investment Group, LLC**, which has laundered, stolen, and/or converted more than $450,000 belonging to Sea Salt.

C.    Claims of fraudulent transfer, conversion, and civil RICO against Defendant **Kimberly Mastropasqua**, to whom Vincent Mastropasqua paid approximately $75,000 once an attachment against him was dissolved by the Court in the Bellerose litigation.

D.    Claims of fraudulent transfer, conversion, and civil RICO against Defendant **Cory Poulin**, who has laundered, stolen, and/or converted more than $55,000 belonging to Sea Salt.

E.    Claims of fraudulent transfer, conversion, and civil RICO against Defendant **Platinum Pawn & Loan**, the pawn shop owned and operated by Defendant Cory Poulin, which has laundered, stolen, and/or converted more than $55,000 belonging to Sea Salt.

F.    Claims of fraudulent transfer, conversion, and civil RICO against Defendant **Constance Bellerose**, who has laundered, stolen, and/or converted more than $7,000 belonging to Sea Salt.

## THE PARTIES

3.    Plaintiff Sea Salt, LLC ("Sea Salt") is a Maine Limited Liability Company engaged in the wholesale lobster distribution business in the City of Saco, County of York, and State of Maine.

4.      Defendant TD Bank, N.A. ("TD Bank") is a U.S. national bank headquartered in Cherry Hill, New Jersey, which is authorized to do business in the State of Maine.

5.      Defendant Bellerose Investment Group ("BIG") is an administratively dissolved Maine Limited Liability Company that was duly formed and authorized to do business in the State of Maine beginning in 2016. Matthew R. Bellerose ("MRB") is the sole member of BIG, which has operated out of Saco and/or Old Orchard Beach, Maine.

6.      Defendant Kimberly Mastropasqua ("KM") is the wife of VJM, a defendant in the Bellerose litigation, and she resides with him in the Town of Scarborough, County of Cumberland, and State of Maine.

7.      Defendant Cory Poulin ("Poulin") is an individual residing in the City of Biddeford, County of York, and State of Maine. Poulin is the licensed pawn broker for Platinum Pawn & Loan located at 292 Main Street in Saco, Maine.

8.      Defendant Platinum Pawn & Loan ("PPL") is an entity listed with the State of Maine Department of Professional and Financial Regulation as a pawnbroker with registration number PNB11498. Upon information and belief, PPL is owned and operated by Cory Poulin and/or Matthew R. Bellerose.

9.      Defendant Constance Bellerose ("CB") is the mother of MRB, a defendant in the Bellerose litigation. She resides in the City of Biddeford, County of York, and State of Maine.

## **JURISDICTION AND VENUE**

10.     Venue is proper in this Court because Plaintiff's principal place of business is in York County, and many of the activities described herein occurred in the County of York and State of Maine.

11.     This Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because of the civil RICO claims alleged against Defendants.

12.     This Court has supplemental jurisdiction over the remaining claims advanced in this Complaint pursuant to 28 U.S.C. § 1331.

<u>**FACTS UNDERLYING THE BELLEROSE LITIGATION**</u>

13.     Sea Salt is a lobster wholesale business located in Saco, Maine that employed Matthew R. Bellerose ("MRB"), who later became a partner in the business.

14.     In 2017, Sea Salt discovered that it was showing a substantial loss of product.

15.     As a result, the company retained both a forensic accountant and a controller to investigate the source of inventory loss.

16.     At all relevant times, MRB was the floor manager at Sea Salt and oversaw the order fulfillment and shipping process of lobsters via UPS.

17.     To fulfill orders, MRB would print a UPS label to affix to the box for shipping. He would then generate a bill of lading for the total amount of lobster shipped to a customer. MRB would then create an invoice in Sea Salt's accounting software based on the bill of lading, which included both the cost of the product and the shipping charges.

18.     From a bookkeeping perspective, any disparity in the amount of lobster shipped versus the amount of lobster that was actually billed would not be detected as long as the manual bill of lading created by MRB matched the invoice he generated.

19.     If no bill of lading or invoice was produced, then nobody would be the wiser if inventory was disappearing—at least in the short term.

20.     In 2017, MRB purported to bring in a new customer named Mastro's.

21.     While MRB did generate some bills of lading and invoices for lobster he shipped to Mastro's, he only did so for a fraction of the product actually shipped.  As set forth in the Affidavit of David Breau (Sea Salt's controller) in the Bellerose litigation, there is a tremendous disparity in the amount of product actually shipped to Mastro's during the time period summarized in the Motion for *Ex Parte* Attachment (November 24, 2017 through the end of April 2018) and the amount that was invoiced and paid for. *See* ECF No. 5-2 through ECF No. 5-11 in the Bellerose litigation (Case No. 2:18-cv-00413-JAW).

22.     In his efforts to uncover the source of this discrepancy, Breau performed a weekly comparison of the legitimate sales and shipping charges to Mastro's, which Bellerose recorded in Sea Salt's Quickbooks program, against UPS shipping records for the same time period.

23.     The UPS records showed the actual weight of product sent to Mastro's customers via UPS, most of which was never invoiced by or paid to Sea Salt in Quickbooks.

24.     Breau was able to discern that Mastro's has been billed and Sea Salt has collected just over $250,000.00 for lobster and shipping between November 2017 and April 2018.

25.      By contrast, Breau's investigation of UPS shipping records showed that MRB shipped nearly $1.5 million in product and shipping charges to Mastro's during the same time period.

26.     According to Breau's calculations, the irrefutable total loss to Sea Salt between November 2017 and the end of April 2018 was $471,620.57.

27.      Averaging that loss over the 22-week period, this amounts to an average weekly loss of $21,437.30.

28.     Applying the average weekly theft amount ($21,437.30) to the time period between 1/1/17 and 11/24/17 when the UPS invoices above are summarized for the Court (total

of 47 weeks), it is highly likely that Sea Salt sustained a loss of $21,437.30 x 47 = $1,007.553.10.

29.     The loss was less dramatic once Breau began carefully tracking Sea Salt's inventory.  In the approximately two months from May to the end of June 2018, when MRB was terminated, the loss was only $17,254.00, and $16,640.36 of that amount was due to the fact that MRB was removed from the premises before he prepared the invoice to Mastro's for the final week of his employment.  During this time period, MRB could not get away with stealing inventory without detection.

30.     Putting the above numbers together, MRB and East End collectively embezzled at least $1,496,427.67 from Sea Salt.

31.     When Sea Salt confronted MRB with this information, he admitted having stolen from the company.

32.     When his business partners raised these irregularities, MRB stated, "I know how this looks.  This looks really bad." He pleaded with his partners: "Tell me how to resolve it." See the Highbarger Affidavit in the Bellerose litigation at Ex A, page 11.

33.     MRB offered to pay back the money he fraudulently converted to his and the other Defendants' unlawful use, stating: "I gave you the 65 or whatever and I might have 80 or 90.  Give me a number and I can, I'll have to chip away at it."

34.     When pointedly asked by one of his partners why he did it, MRB acknowledged the wrongdoing by asking: "Does it really matter?"

35.     Shortly thereafter, MRB sent his partners an apologetic text that read: "Guys, I just want to say I'm really sorry.  Not only have I betrayed your trust but years of friendship as

well and that alone will haunt me forever… I'd like to resolve this as best as I possibly can with you guys without my innocent family having to suffer for my bad decisions."

36.     In this same text exchange, MRB attempted to explain the embezzlement: "I was just trying to cover the expense of buying my 20% [share of Sea Salt, LLC] as I wouldn't have been able to do it otherwise."

37.     The McKellar Affidavit shows that this fraudulent scheme went back as far as 2015, making the likely amount of loss well over $1.5 million and likely in excess of $2 million.

38.     MRB used a sham entity that he set up with VJM called East End Transport, LLC in furtherance of his fraud.

39.     East End paid all of Sea Salt's invoices to "Mastro's" in furtherance of Defendants' fraudulent scheme to embezzle more than $1.5 million from Sea Salt.

## FACTS DISCOVERED DURING THE BELLEROSE LITIGATION

40.     In the Bellerose litigation, Plaintiff obtained an *ex parte* order of attachment and trustee process against Matthew R. Bellerose ("MRB") and East End Transport, LLC ("East End").

41.     The attachment against MRB and East End was based on the affidavits of Sea Salt's three owners (Shawn McEwen, Morey Highbarger, and Michael McKellar), plus its accountant David Breau.

42.     After the York County Superior Court entered an *ex parte* order of attachment, the Bellerose litigation was removed to this Court.

43.     The above affidavits and underlying attachments are publicly available on the docket as ECF No. 5-2 through ECF No. 5-11 in the Bellerose litigation (Case No. 2:18-cv-00413-JAW).

44.     East End defaulted in the Bellerose litigation and after a hearing the Court entered a default judgment against East End in the amount of $4.5 million.

45.     During the Bellerose litigation, it became clear that East End was not organized for any legitimate business purpose other than to steal and ship lobsters from Sea Salt and retain the proceeds from the sale of stolen lobsters.

46.     MRB and East End laundered money stolen from Sea Salt by mixing the tainted proceeds of theft with the legitimate sale of lobster to a fictitious customer named "Mastro's," which happens to the first six letters of East End's founder, VJM.

47.     In the Bellerose litigation, MRB has invoked his Fifth Amendment rights to avoid self-incrimination, thereby essentially failing to defend the action.

**Defendants TD Bank and Bellerose Investment Group ("BIG")**

48.     In the Bellerose litigation, Plaintiff subpoenaed PayPal records and learned that MRB had been laundering money from the "East End Transport" account he used to embezzle from Sea Salt, by transferred the funds from East End's PayPal account into another TD Bank account that ends in the numbers 6754.

49.     Upon information and believe, the TD Bank account ending in 6754 was opened under the name "Bellerose Investment Group, LLC." Although Matthew Bellerose was a beneficial owner of this account, it was not attached when Plaintiff served a trustee summons on Defendant TD Bank, NA.

50.     Bellerose Investment Group, LLC ("BIG") is connected to the fraud and embezzlement alleged in the Bellerose litigation because East End Transport, LLC paid the mortgage for an investment property owned by BIG located at 823 Portland Road in Saco, Maine.

51. VJM, a defendant in the Bellerose litigation, admitted that MRB was looking to buy the property now owned by BIG in order to store and ship lobsters.

52. MRB is the sole member of BIG, which upon information and belief does not have any legitimate business purpose other than aiding and abetting the fraud, embezzlement, and criminal conspiracy alleged in the Bellerose litigation.

53. Sea Salt served a trustee summons on Defendant TD Bank on August 8, 2018.

54. TD Bank responded to the trustee summons with a disclosure dated August 24, 2018.

55. TD Bank disclosed that it held assets belonging to the Defendants in the Bellerose litigation amounting to $170,241.05. *See* ECF No. 5-31 in the Bellerose Litigation.

56. VJM, who was MRB's business partner in the sham entity East End, submitted an affidavit to the Court stating under oath that $152,400 of the funds attached by TD Bank belonged to him or his wife.

57. The Court later dissolved the attachment against VJM, meaning that only $17,841.05 of the funds attached by trustee process remained to satisfy the judgment against East End.

58. East End's August 2018 statement shows that MRB withdrew $25,028 in cash for himself on 8/9/2018, the day after TD Bank was served with a trustee summons.

59. As a result of TD's failure to attach, seize and/or freeze assets belonging to BIG, Plaintiff has suffered significant financial harm and the assets in the account ending in 6754 have dwindled. Under Maine law, TD is considered trustee for those funds because of its failure to disclose them.

60.     TD negligently failed to abide by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") regulations regarding identification of beneficial owners for business accounts, because Matthew R. Bellerose, against whom Plaintiff obtained an attachment in the Bellerose litigation, was considered an account holder or beneficial owner of BIG.

61.     TD's negligence and violation Maine's trustee process statute caused Plaintiff to suffer more than $400,000 in economic damages.

### Defendant Kimberly Mastropasqua ("KM")

62.     Defendant Kimberly Mastropasqua ("KM") is married to a defendant in the Bellerose Litigation, Vincent J. Mastropasqua ("VJM").

63.     In the Bellerose Litigation, Sea Salt obtained an attachment against VJM, who founded East End along with MRB.

64.     By making multiple misrepresentations to the Court, VJM was able to get the attachment against him dissolved. *See* ECF No. 5-19 in the Bellerose litigation.

65.     VJM cut himself multiple checks from the fraudulent East End account as well as East End payroll checks.

66.     VJM made multiple cash deposits into his TD Bank account from unknown sources that do not make sense since he was a low wage earner.

67.     VJM's TD Bank account statements reveal almost $75,000 of untraceable, presumably tainted funds that he earned by participating in MRB's theft from Sea Salt.

68.     VJM's affidavit to the Court in the Bellerose litigation omitted much of the cash transactions he engaged in while participating in MRB's theft from Sea Salt.

69.     Immediately after the Court dissolved the attachment against him in the Bellerose

11

Litigation, VJM withdrew and moved the funds held by TD Bank.

70.    VJM withdrew approximately $75,000 in tainted funds from the TD Bank account where he had deposited fraudulent paychecks and other money stolen from Sea Salt.

71.    VJM deposited the $75,000 in funds he withdrew from TD Bank in a checking account in his wife's name only, ending in 6141.

72.    At deposition in the Bellerose litigation, VJM admitted that, after the attachment against him was lifted, he gave approximately $75,000 from the account to his wife, KM, to be deposited in a separate account in her name only.

73.    KM used the funds to purchase a home in her name only.

74.    In the Bellerose litigation, VJM admitted that the home he lives in with KM was purchased in her name only, and he was not on the mortgage, because: "I have a lawsuit against me."

### Defendants Cory Poulin ("Poulin") and Platinum Pawn & Loan ("PPL")

75.    On 12/29/17, MRB paid Cory Poulin $50,000 from the East End account for "PP+L," which presumably stands for Poulin's pawn shop, Platinum Pawn & Loan.

76.    Upon information and belief, MRB was involved with Poulin in the pawn shop business because MRB emailed himself information about three separate payroll accounts on 1/31/18. One payroll account was for East End and included VJM's social security number. The next payroll account was for Bellerose Investments. Finally, MRB included Cory Poulin's information and Platinum Pawn as one of the payroll accounts he was monitoring.

77.    MRB has a history of working in and profiting from illegal activities in pawn shops, including in 2007 when he was convicted of receiving stolen property in connection with another Maine pawn shop.

78.     On 4/30/18, MRB paid $3,000 from the East End account in a check made out to Platinum Pawn.

79.     On 5/7/18, MRB paid $3,500 from the East End account in a check made out to Platinum Pawn + Jewelry.

80.     Upon information and belief, Poulin and/or PPL had no legitimate business dealings with MRB or East End that would justify the payment of funds belonging to Sea Salt to either Defendant.

81.     From the fraudulent "East End" bank account holding hundreds of thousands of dollars belonging to Sea Salt, MRB paid Poulin and/or PPL more than $56,000 dollars in stolen, tainted, laundered money.

### Defendant Constance Bellerose ("CB")

82.     Defendant Constance Bellerose ("CB") is the mother of MRB, a defendant in the Bellerose litigation.

83.     MRB paid CB a fraudulent salary from the East End payroll account he maintained through ADP.

84.     At his deposition in the Bellerose litigation, VJM admitted that CB did not perform any work for East End or do anything else to draw a legitimate paycheck from the company.

85.     From the fraudulent "East End" bank account holding hundreds of thousands of dollars belonging to Sea Salt, MRB paid CB more than $7,000 dollars in stolen, tainted, laundered money.

## COUNT I – TD BANK'S FAILURE TO DISCLOSE
### (14 M.R.S. §§ 2614; 2702)
### (Defendant TD Bank, NA)

86.     Plaintiff repeats the allegations contained in Paragraphs 1 through 85 as if fully stated herein.

87.     In August of 2018, Plaintiff served a trustee summons on TD Bank.

88.     TD Bank disclosed and froze the East End account ending in 6043. However, TD Bank neither disclosed nor froze the assets in account 6754, into which MRB was laundering and depositing hundreds of thousands of dollars.

89.     The Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) released new regulations in 2018 requiring banks to perform due diligence to determine the beneficial owners of business accounts, in order to reduce the incidence of money laundering and other financial crimes.

90.     TD Bank has a form called "Certification Regarding Beneficial Owners of Legal Entity Customers," which it should have had the account holder for 6754 fill out.

91.     Upon information and belief, the above form/due diligence regarding beneficial ownership would have alerted TD that MRB was the beneficial owner of the account ending in 6754. If TD Bank had taken these steps, it would have disclosed the account ending in 6754, and the assets in that account would have been frozen to satisfy a judgment obtained by Sea Salt.

92.     Even in the absence of this form, TD Bank knew or should have known that "Bellerose Investment Group, LLC" is no longer a legitimate business entity. TD Bank also knew or should have known that Matthew Bellerose was an authorized user and/or beneficial owner of the account ending in 6754.

93.     Upon information and belief, Matthew R. Bellerose was an "account holder" pursuant to the definition set forth in 31 C.F.R. § 212.3, because he was the beneficial owner of the Bellerose Investment Group, LLC account.

94.     Under 14 M.R.S. § 2614, TD Bank failed to disclose Defendant MRB's ownership in the account ending in 6754, and therefore TD Bank should be defaulted and adjudged the trustee of that account.

95.     Pursuant to 14 M.R.S. § 2702, TD Bank willfully and knowingly submitted a false disclosure under oath, omitting the balance of the BIG account from the disclosure and failing to freeze the assets in the account, and therefore TD Bank is liable to Sea Salt for "so much of the judgment recovered against the principal defendant as remains unsatisfied."

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court enter a default and judgment in its favor and against Defendant TD Bank, adjudge TD Bank trustee of the account ending in 6754, and award damages to Plaintiff in the amount of $459,200, or the entire amount of the judgment against Matthew R. Bellerose in this case that remains unsatisfied, plus equitable and injunctive relief, as well as attorney's fees, costs, and such other and further relief as this Court deems just and appropriate.

## COUNT II – NEGLIGENCE
### (Defendant TD Bank, NA)

96.     Plaintiff repeats the allegations contained in Paragraphs 1 through 95 as if fully stated herein.

97.     TD Bank owed Plaintiff a duty to make reasonable inquiry and safeguard funds deposited in customer accounts.

98.     TD Bank had a duty to monitor East End and Bellerose Investment Group's banking transactions, and to report to the IRS any suspicious activity.

99.     Defendants engaged in multiple suspicious banking transactions with TD Bank, including without limitation the structuring of cash withdrawals that approached but did not exceed $10,000, in order to avoid IRS detection.

100.    TD Bank was on notice of Defendants' suspicious banking activity, and therefore owed a duty of care to Plaintiff to ensure that fraudulent transactions suggestive of money laundering were detected, reported, and prevented.

101.    TD Bank breached the above duty of care, and its breach proximately caused harm to Plaintiff.

102.    Defendant MRB laundered money through TD Bank accounts, as well as PayPal, transferring more than $459,200 between accounts in a manner that should have been detected by TD Bank.

103.    In December of 2016 alone, Defendants MRB and East End engaged in multiple suspicious cash transactions involving thousands of dollars. Meanwhile, on December 16, 2016, East End transferred $40,000 to the account ending in 6754, which upon information and belief is an account held in the name of Bellerose Investment Group, LLC.

104.    From December 2016 forward, including through December 2019 and likely continuing to the present, MRB has transferred hundreds of thousands of dollars from PayPal into the account ending in 6754. The total amount of loss to Plaintiff from the TD Bank money laundering transactions alone is $459,200.

105.    TD Bank also owed Plaintiff a duty of care arising under Maine law to accurately disclose and freeze assets belonging to MRB, as either an account holder or beneficial owner of a TD Bank account, upon receipt of a trustee summons on behalf of Plaintiff in August of 2018.

106.     TD Bank breached the above duty to accurately disclose and freeze assets belonging to MRB when it received a trustee summons on behalf of Plaintiff in August of 2018.

107.     As a result of TD Bank's negligence set forth above, Plaintiff sustained foreseeable financial harm and economic loss.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court enter judgment in its favor and against Defendant TD Bank for negligence, and grant monetary, equitable, and injunctive relief, as well as attorney's fees and costs, plus such other and further relief as this Court deems just and appropriate.

### COUNT III – MAINE UNIFORM FRAUDULENT TRANSFER ACT
### (14 M.R.S. § 3579(2))
### (Defendants BIG, KM, Poulin, PPL, and CB)

108.     Plaintiff repeats the allegations contained in Paragraphs 1 through 107 as if fully stated herein.

109.     Plaintiff is a creditor of VJM and MRB, defendants in the Bellerose litigation, within the meaning of the Maine Uniform Fraudulent Transfer Act ("UFTA").

110.     VJM and MRB, defendants in the Bellerose litigation, were debtors of Sea Salt within the meaning of the UFTA.

111.     MRB transferred to Defendant BIG more than $450,000 in cash, making BIG a transferee within the meaning of 14 M.R.S. § 3579(2).

112.     MRB's transfers to BIG are voidable within the meaning of the UFTA, and the transfers were fraudulent, because they were to an insider, the debtor retained possession and control of the assets, MRB was sued or threatened with suit before the transfers, the transfers represented a substantial amount of MRB's assets, no value or consideration was given for the transfers, and the intent of the transfers was to hide or conceal assets from Sea Salt.

113.     VJM transferred to himself and then his wife, Defendant KM, almost $75,000 in cash, making KM a transferee within the meaning of 14 M.R.S. § 3579(2).

114.     VJM's transfers to himself and KM are voidable within the meaning of the UFTA, and the transfers were fraudulent, because they were to an insider, the debtor retained possession and control of the assets, VJM was sued or threatened with suit before the transfers, the transfers represented a substantial amount of VJM's assets, no value or consideration was given for the transfers, and the intent of the transfers was to hide or conceal assets from Sea Salt.

115.     MRB transferred to Defendants Poulin and/or PPL more than $55,000 in cash, making Poulin a transferee within the meaning of 14 M.R.S. § 3579(2).

116.     MRB's transfers to Defendants Poulin and/or PPL are voidable within the meaning of the UFTA, and the transfers were fraudulent, because they were to an insider, the debtor retained possession and control of the assets, MRB was sued or threatened with suit before the transfers, the transfers represented a substantial amount of MRB's assets, no value or consideration was given for the transfers, and the intent of the transfers was to hide or conceal assets from Sea Salt.

117.     MRB transferred to Defendant CB more than $7,000 in cash, making CB a transferee within the meaning of 14 M.R.S. § 3579(2).

118.     MRB's transfers to CB are voidable within the meaning of the UFTA, and the transfers were fraudulent, because they were to an insider, the debtor retained possession and control of the assets, MRB was sued or threatened with suit before the transfer, no value or consideration was given for the transfers, and the intent of the transfers was to hide or conceal assets from Sea Salt.

119.    The transfers to Defendants BIG, KM, Poulin, PPL, and CB were made with the actual intent to hinder, delay or defraud Sea Salt.

WHEREFORE, Plaintiff Sea Salt, LLC seeks all damages to which it is entitled under the Maine Uniform Fraudulent Transfer Act, including a monetary judgment against transferee Defendants BIG, KM, Poulin, PPL, and CB, as well as such other and further relief as this Court deems just and appropriate.

## COUNT IV – CONVERSION
### (Defendants BIG, KM, Poulin, PPL, and CB)

120.    Plaintiff repeats the allegations contained in Paragraphs 1 through 119 as if fully stated herein.

121.    Defendants in the Bellerose litigation (MRB, VJM, and East End) embezzled funds from Sea Salt by stealing a massive amount of live lobster product and shipping it to customers, then retaining the proceeds in an account under the name East End Transport, LLC.

122.    The Bellerose litigation defendants then laundered money stolen from Sea Salt by paying it to Defendants BIG, KM, Poulin, PPL, and CB.

123.    Defendants BIG, KM, Poulin, PPL, and CB had no right to possession of the money or property belonging to Sea Salt, and no right to convert such assets to their own use. d

124.    Defendants BIG, KM, Poulin, PPL, and CB converted and misappropriated the property described above for their own use with the specific intent to defraud Sea Salt, which had the right to possession of the property converted.

125.    Upon information and belief, one or more of the Defendants BIG, KM, Poulin, PPL, and/or CB has knowledge of the Bellerose litigation and Sea Salt's demand for repayment, yet they have failed to return cash and assets rightfully belonging to Sea Salt.

126.    Defendants have engaged in intentionally outrageous conduct, or alternatively consciously disregarded the harm that their conduct would cause Sea Salt, such that malice can be implied, justifying an award of punitive damages.

127.    As a result of Defendants' conversion, Sea Salt has suffered economic loss and other harm, justifying an award of compensatory damages in excess of $1.4 million.

WHEREFORE, Plaintiff Sea Salt, LLC requests that the Court award it damages for conversion against Defendants, punitive damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to the company by law.

## COUNT V – CIVIL RICO (VIOLATION OF 18 U.S.C. § 1962(C))
### (Defendants BIG, KM, Poulin, PPL and CB)

128.    Plaintiff repeats the allegations contained in Paragraphs 1 through 127 as if fully stated herein.

129.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), who participated, directly or indirectly, in the affairs of the criminal enterprise and fraudulent scheme described in the Bellerose litigation, through an ongoing pattern of racketeering activity in violation of 18 U.S.C. § 1962(C) ("RICO").

130.    By and through their acceptance of tainted funds from the criminal enterprise described in the Bellerose litigation, each of the Defendants BIG, KM, Poulin, PPL and CB engaged in at least two predicate acts as part of a pattern of continuous, related instances of criminal behavior that amounted to racketeering activity within the meaning of 18 U.S.C. § 1961.

131.    Each of the Defendants BIG, KM, Poulin, PPL and CB engaged in conduct that meets the definition of wire fraud, money laundering, and/or engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957).

132.    Defendants' racketeering activity involved numerous separate acts and transactions, each constituting a crime within the meaning of RICO, that amounted to at least 2 separate criminal acts that affected multiple parties.

133.    There is a threat of continued criminal activity on the part of the Defendants.

134.    Plaintiff Sea Salt has been injured in both its business affairs and its property.  Sea Salt has suffered actual, extensive harm and damage to its business and economic interests because of the RICO violations set forth herein.

135.    Because of Defendants' RICO violations, Sea Salt is entitled to treble damages plus attorney's fees under 18 U.S.C. § 1964.

136.    RICO § 1964(a) also authorizes the Court to "prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons."

137.    Based on the above, Plaintiff seeks an "appropriate order" disgorging the profits illegally gained by Defendants, as well as disgorgement or forfeiture of any proceeds of their fraud that has been paid to their attorneys.

WHEREFORE, Plaintiff Sea Salt requests that the Court enter judgment in its favor and against Defendants on its Civil RICO claim, award monetary damages, treble damages, disgorgement of profits, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff Sea Salt, LLC hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated:   March 16, 2020

/s/ Laura H. White

_____
Laura H. White, Esq., Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com